**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**December 8, 2010**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**
_____

CURT BROCKMANN; ANGIE
BROCKMANN; STEPHANIE
BRINKER; DEAN BROWN; PATTIE
BROWN; RACHELLE BURTON;
T.W. BURTON; KURT CHRYSLER;
DEE CHRYSLER; MARK
DAUGHERTY; KIM DAUGHERTY;
DON DOSCH; BESS DOSCH;
DUSTIN GARY; JILL GARY; KIRK
HOEFFNER; HOLLY HOEFFNER;
MARVIN IREY; PATRICIA IREY;
SARAH MCABEE; RITESCH
PATEL; MANISHA PATEL; BILL
PFEIFER; JUDY PFEIFER; DAN
ROBERTS; PAM ROBERTS; JON
SCHAEFER; KATHERINE
SCHAEFER; MICHAEL TENNYSON;
LORI TENNYSON; JEFF WYLIE;
REBECCA WYLIE; MEDALLION
HOMES, INC.,

     Plaintiffs-Appellants,

v.

THE BOARD OF COUNTY
COMMISSIONERS OF THE
COUNTY OF SHAWNEE; SEWER
DISTRICT 74,

     Defendants,

and

No. 09-3042
No. 09-3051
(D.C. No. 5:07-CV-04103-EFM)
(D. Kan.)

GENERAL CASUALTY
INSURANCE COMPANY OF
WISCONSIN,

     Garnishee-Appellee.

---

## ORDER AND JUDGMENT[*]

---

Before **LUCERO**, **MURPHY**, and **HOLMES**, Circuit Judges.

---

This case arises out of a heavy rain storm in Kansas that caused more than a dozen homes to be flooded with sewage water. Curt and Angie Brockmann and certain other home owners ("Plaintiffs") initially sued L.P.'s Excavating Inc. ("L.P.'s") and Shawnee County in Kansas state court seeking monetary damages resulting from the sewage flood of their homes. Shawnee County demanded that L.P's insurer, General Casualty Insurance Company of Wisconsin ("General Casualty"), provide it with a defense; General Casualty initially refused, explaining that, under L.P.'s policy, Plaintiffs' claims did not give rise to coverage for Shawnee County. Plaintiffs eventually entered into a covenant not to execute with Shawnee County, and the County gave Plaintiffs whatever rights it possessed in L.P.'s General Casualty insurance policy and agreed not to put on

---

[*]      This Order and Judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. It may be cited, however, for its persuasive value consistent with Federal Rule of Appellate Procedure 32.1 and Tenth Circuit Rule 32.1.

any defense in the state court action. As promised, Shawnee County put on no defense in the state court action and was found liable.

Plaintiffs then filed a garnishment action in state court against General Casualty, which the insurer removed to federal court. Plaintiffs now appeal the district court's order granting General Casualty's motion for summary judgment, denying Plaintiffs' motion for summary judgment, and partially granting General Casualty's motion for attorneys' fees. General Casualty cross-appeals, challenging the district court's order allowing Plaintiffs to file an untimely reply to its answer in this garnishment action. Exercising jurisdiction pursuant to 28 U.S.C. § 1291, we **AFFIRM** the district court's grant of General Casualty's motion for summary judgment and partial grant of its motion for attorneys' fees; because we find that General Casualty's cross-appeal is moot, we decline to reach it.

## FACTUAL BACKGROUND[1]

Shawnee County is in charge of a number of sewer systems, including Sewer District 74, where Plaintiffs' homes are located in Topeka, Kansas (generally in the Lake Sherwood neighborhood). Sewer District 74 is a

---

[1] This background section is largely drawn from the district court's factual findings in its January 12, 2009 Memorandum and Order. On appeal, Plaintiffs do not dispute any of the district court's factual findings; rather, Plaintiffs contest the legal conclusions that the district court drew from the facts.

governmental entity operated jointly by the City of Topeka and Shawnee County.[2] On January 13, 2005, Shawnee County entered into a contract with Bartlett & West Engineers, Inc. ("Bartlett") for the company to provide construction engineering services for various bridge, road, and sewer projects. On May 9, 2005, on behalf of Sherwood Park Development LLC, Bartlett sent L.P.'s an invitation to bid on certain sewer projects in the Lake Sherwood area. The invitation agreement provided that the project was a developer-financed project, and that the owner was Shawnee County or its representatives. L.P.'s submitted its bid, and it was accepted on May 20, 2005.

In July 2005, L.P.'s began extending the County's sewer system into the Lake Sherwood area by attaching additional sewer pipes to the existing system. Bartlett representatives confirmed that the project was following the County's specifications.[3] L.P's began installing the proper pipe on August 16, and on August 17, L.P.'s inserted a plug in the newly installed pipe to prevent the flow of dirt and water into the existing system.

---

[2] We note that Shawnee County and Sewer District 74 are not parties to this appeal. Shawnee County assigned its interest in the General Casualty insurance policy to the Plaintiffs; stepping into the County's place, the Plaintiffs filed a garnishment action against General Casualty, which is the subject of this appeal.

[3] For example, on August 11, 2005, Bartlett had L.P.'s remove already-installed new pipe because it did not conform to the type of pipe called for in the County's specifications.

On August 19, 2005, Topeka was hit by a severe storm, which resulted in flooding in the cavity left at the work site. This flooding increased pressure on the main sewer system when the newly extended pipe was infiltrated. As a result of this infiltration, there was an overflow of sewage in the system, which led to a failure of a sewer pump in the Lake Sherwood area and, of particular relevance to this lawsuit, flooding to a number of homes in the area.

On April 12, 2006, most of the homeowners affected by the flooding submitted a demand letter to Shawnee County under § 12-105(b) of the Kansas Statutes Annotated.[4] In this letter, Plaintiffs claimed that Shawnee County was liable for negligence for failing to meet its standard of care in plugging the sewer system and for the nuisance created by the flooding of their homes. Plaintiffs demanded damages for nuisance, negligence, stigma, and personal injury. Plaintiffs sent another letter to Shawnee County on May 3, 2006, informing the County that L.P.'s was insured under a policy with General Casualty. In this letter, Plaintiffs also informed Shawnee County that an offer to settle the claims for $2 million would be held open for thirty days. Shawnee County never provided General Casualty with this settlement offer.

---

[4] The only part of the letter identifying L.P.'s was the first sentence of the uncontroverted facts, which stated: "L.P. [sic] Excavating with the knowledge of a Shawnee County sewer employee dug a trench in Sherwood Park Subdivision No. 8." Aplt. App. at 485.

In response to the May 3 letter—after the expiration of the settlement offer, but prior to Plaintiffs filing suit—Shawnee County sent its own letter, dated June 30, 2006, notifying General Casualty of the damages Plaintiffs claimed to have sustained in an incident involving General Casualty's insured, L.P.'s. The County requested information about the policy held by L.P.'s and stated that the letter would "serve as a written demand . . . for a defense and payment of any claims related to this incident asserted against Shawnee County as a result of the negligence of [L.P.'s]." Aplee. Suppl. App. at 1725.

After receiving this letter, General Casualty's corporate counsel for claims took steps to learn about the underlying case and determined that the proper venue was Kansas. He then hired outside coverage counsel to act on General Casualty's behalf, to conduct "whatever investigation was appropriate" under Kansas law, and to provide a coverage opinion. *Id.* at 1629–30.

On August 24, 2006, Plaintiffs Angie and Curt Brockmann filed their petition in state court ("state court petition"), claiming that the

> flooding was caused by the negligence of defendant L.P. [sic] Excavating by failing to meet its standard of care in closing off the sanitary sewer system . . . and defendant Shawnee County, in failing to properly plan, inspect, maintain, repair, or upgrade as necessary, the sanitary sewer system . . . so as to accommodate sewage without infiltrating the Brockmann's home.

*Id.* at 1522. Plaintiffs further claimed that Shawnee County was "negligent in failing to act upon the negligence of L.P.'s Excavating." *Id.*

-6-

On September 22, 2006, Shawnee County sent a second demand letter to General Casualty. In this letter, to which the County attached a copy of the state court petition, the County noted that the lawsuit "related to the negligence of your insured, LP [sic] Excavating," and it reiterated its request for coverage and defense using language identical to its original request. *Id.* at 1728; *see also id.* at 1729–33.

In investigating the claim, General Casualty's outside coverage counsel reviewed the petition and the First Amended Petition,[5] the insurance policy, information developed by an independent adjustor, Plaintiffs' demand letter to the City of Topeka, and the investigation conducted by L.P.'s defense counsel. Based on his review of this information, counsel formed the opinion that, under Kansas law, there was no agency relationship between Shawnee County and L.P.'s and, accordingly, there was no claim asserted against Shawnee County under which it could be held liable for L.P.'s actions (i.e., the actions of its named insured). In a letter dated October 23, 2006, General Casualty informed Shawnee County that the claims asserted by Plaintiffs against the County did not give rise to coverage under the policy, and therefore, General Casualty declined to defend the County.

General Casualty reasoned that the policy was limited because it did not provide coverage for "any liability due to negligence attributable to any person or

---

[5] Plaintiffs filed a First Amended Petition on September 15, 2006; however, it merely corrected the spelling of Curt Brockmann's first name.

entity other than the Named Insured." *Id.* at 1737. Thus, because the petition alleged that Shawnee County was negligent for its own actions, rather than for the acts of L.P.'s, the insurer concluded that no coverage was provided. However, General Casualty qualified its denial by informing the County that if it was aware of any facts, allegations, or documents that would establish coverage under the policy, "General Casualty [was] willing to reevaluate its position and make further analysis of all information known to [Shawnee County] or to any other party in the case that has a bearing on the issue of coverage." *Id.* General Casualty further stated that it would reassess its position should new information become available in the future, and requested that the County forward to it any such information.

After Shawnee County received this letter denying coverage, it communicated General Casualty's position to Plaintiffs' counsel. Plaintiffs' counsel responded by letter that he disagreed with General Casualty's analysis not to defend "because [it does] not believe [Shawnee County is] liable for the conduct of L.P. [sic] Excavating's actions." *Id.* at 1740. He also notified Shawnee County of his intention to move the court to add additional plaintiffs. On December 5, 2006, Shawnee County informed General Casualty by letter that Plaintiffs believed Shawnee County would be "held responsible for the negligence of L.P.'s Excavating" and also notified General Casualty of their intent to add additional plaintiffs to the action. *Id.* at 1742. On December 8, 2006, the

-8-

insurer's outside coverage counsel, on behalf of General Casualty, responded by requesting a copy of the amended petition and informed Shawnee County that the insurer was willing to reevaluate its previous coverage decision. Despite this December 2006 expression of willingness to reevaluate, Shawnee County did not communicate with General Casualty again until June 2007, one month before the state court trial was set to begin.

On December 6, 2006, Plaintiffs' counsel sent a letter to Shawnee County detailing, *inter alia*, a proposed covenant not to execute against Shawnee County. In exchange for the covenant not to execute, Shawnee County would pay Plaintiffs $200,000 and assign its rights under the General Casualty insurance policy to Plaintiffs. In addition, the County would permit entry of judgment in the state court case while promising not to contest any evidence offered by Plaintiffs or submit any evidence on its behalf. The agreement further provided that if Plaintiffs were successful in obtaining a judgment against General Casualty, Shawnee County would receive "first dollar reimbursement" regarding any settlement with General Casualty, and Plaintiffs also would pursue Shawnee County's attorneys' fees and litigation costs. *Id.* at 1748. The proposed covenant, however, required Shawnee County to join Plaintiffs in opposing any attempt by General Casualty to intervene or participate in the action, and further required the parties to maintain secrecy of the covenant, with limited exceptions.

Plaintiffs' counsel also attached a draft journal entry of judgment to the letter for the County's review. The draft stated that all parties were prepared for trial, but that L.P.'s and Shawnee County introduced no evidence. It further provided that "[d]efendant Shawnee County has notified General Casualty that Plaintiff alleges the county is responsible for the negligence of L.P. [sic] Excavating." *Id.* at 1753. The proposed journal entry awarded nuisance, stigma, and actual damages. In rendering the judgment, the proposed journal entry relied on *Davis v. Kansas City*, 464 P.2d 154 (1970), and provided that L.P.'s was 70% at fault and Shawnee County was 30% at fault for the flood damage to Plaintiffs' homes. *See Davis*, 464 P.2d at 160 (holding that when a municipality retains control over an independent contractor by virtue of the contractual relationship between the two, the municipality is not immune for liability arising from the independent contractor's actions). The draft journal entry awarded $1,699,414.40 in damages—ordering Shawnee County to pay $1,189,608 due to L.P.'s negligence and $509,832.30 due to its own negligence. Neither Shawnee County nor Plaintiffs provided General Casualty with a copy of the covenant not to execute or the proposed journal entry of judgment.[6]

---

[6] Also on December 6, 2006, Plaintiffs' counsel sent a letter to potential plaintiffs in the action detailing the plans for the covenant not to execute and explaining that "[b]ecause our damages without insurance would be capped against the County at $500,000[,] I believe it is better to release the County itself and to pursue the claim directly against General Casualty." Aplee. Suppl. App. at

(continued...)

Meanwhile, Plaintiffs entered into negotiations with L.P.'s and General Casualty to settle the claims against L.P.'s. The parties agreed that Plaintiffs would release their claims against L.P.'s for $800,000. Plaintiffs signed releases to this effect throughout December 2006 and January 2007; based on these releases, L.P.'s was dismissed from the case on February 5, 2007.

On May 22, 2007, Plaintiffs filed their Second Amended Petition, adding a number of plaintiffs and changing the named defendants from L.P.'s and Shawnee County to Shawnee County and Sewer District 74. The amended petition claimed that the

> flooding was caused by the negligence of L.P. [sic] Excavating by failing to meet its standard of care in closing off the sanitary sewer system at Sherwood Park Subdivision 8 . . . and . . . [by] defendants Shawnee County and Sewer District 74 in failing to properly plan, inspect, maintain, repair, or upgrade as necessary, the sanitary sewer system servicing plaintiffs' homes.

*Id.* at 1530. Shawnee County filed its answer to Plaintiffs' Second Amended Petition on June 11, 2007, alleging, among other defenses, that it was immune from liability under the Kansas Tort Claims Act and that other parties were comparatively at fault.

---

[6](...continued)
1745. He further explained that if "the journal entry is signed by the judge we will have gained significant leverage with regard to the insurance coverage" and then explained the risk that General Casualty could later argue Plaintiffs' contemplated release of L.P.'s also acted as a release of the County. *Id.* at 1745–46.

Then on June 15, 2007, after it had already filed its answer, Shawnee County sent a copy of the Second Amended Petition, its answer, and a letter demanding coverage and defense under L.P.'s policy to General Casualty. The letter explained that a pretrial conference was scheduled for July 2, 2007, and that trial would commence on July 18, 2007.

In response to this letter, on June 29, 2007, General Casualty faxed a letter to the County detailing the insurer's willingness to provide a defense under a reservation of rights while disclaiming coverage under the policy. General Casualty then retained counsel to defend Shawnee County in the action. After learning of Shawnee County's intention to enter into the covenant not to execute, General Casualty, in a letter dated July 3, 2007, reaffirmed its offer to provide a defense and discussed its objection to any agreement where Shawnee County would concede or confess judgment and waive its defenses.[7] Nevertheless, the

---

[7] The letter stated:

> This is to advise Shawnee County that General Casualty Company reiterates its offer to defend the County in the above lawsuit under the terms of the reservation of rights letter that was sent to you on June 29, 2007. However, General Casualty Company does not acquiesce in the County entering into an assignment of rights and covenant not to execute, or any other agreement under any title whereby the County concedes or confesses judgment o[r] fails to defend or takes an inactive or passive position concerning the defense of the claims against it.

Aplee. Suppl. App. at 1787.

-12-

Board of County Commissioners approved the covenant not to execute and assignment of rights on July 5, 2007,[8] and the County subsequently declined General Casualty's offer to defend it in the pending action due to its agreement with Plaintiffs.

On July 18, 2007, the case was called for bench trial, where Plaintiffs admitted exhibits and presented limited testimonial evidence on damages. Shawnee County—consistent with its covenant not to execute and the proposed journal entry of judgment—presented no evidence, declined its opportunity to cross-examine any witness, and made no closing argument. The court found L.P.'s negligent for failing to close off the sewer line at the end of the work day on August 18, 2005, and Shawnee County negligent for failing to maintain and inspect the sewer lines serving the Lake Sherwood area. The court awarded damages largely in accordance with the proposed journal entry of judgment and stipulated damage grid—minus amounts for personal injury damages, which Plaintiffs had withdrawn.[9] Plaintiffs then filed a state court garnishment action,

---

[8] The covenant not to execute approved by the Board differed from the December 2006 proposed covenant not to execute. The paragraph in which the parties agreed to oppose and not cooperate with General Casualty on any attempt to intervene or participate in the action had been removed.

[9] L.P.'s and Shawnee County were adjudged liable for negligence, nuisance, and stigma damages in the amount of $2,831,600. L.P.'s was found 70% liable and Shawnee County was found 30% liable. The court ordered that Shawnee County pay $1,982,120 due to L.P's negligence and $849,480 due to its own negligence.

-13-

attempting to collect the judgment from General Casualty.  In response, General

Casualty removed the action to federal court and then filed an answer.

Shawnee County filed its answer to the garnishment action on August 31,

2007, prior to removal of the action to federal court.  The County's answer was

served on September 20, 2007—three days after the notice of removal was served.

General Casualty then filed an amended answer on September 25, 2007.  Both the

original answer and the amended answer filed by General Casualty expressly

denied all indebtedness.  Plaintiffs did not file a reply to the answer of garnishee

or the answer of Shawnee County.

Under Kansas law, ordinarily a purported creditor must file a reply to an

answer within ten days in order to proceed on its claim.  *See* Kan. Stat Ann. § 60-

738(a) (2002) (amended 2010).[10]  As a result of this omission, General Casualty

filed a motion for judgment on the pleadings on January 14, 2008, informing the

court of the legal significance of the failure to file a reply.  Counsel for Plaintiffs

responded with a motion seeking leave to file an untimely reply, which was filed

on January 18, 2008—more than ninety days following the expiration of the

_____

[10]     More specifically, the deadline for filing a reply controverting the garnishee's answer is fixed by statute as "[n]o later than 10 days after the garnishee makes the answer and the clerk or the garnishee sends it to the judgment creditor."  Kan. Stat Ann. § 60-738(a) (2002) (amended 2010).  If a reply is filed, the law requires a hearing within thirty days.  If no reply is filed, the garnishee is permitted to release all garnished funds if sixty days elapses without an order to pay funds to the court.  *See id.* § 60-739 (2003) (amended 2010).

statutory deadline. The magistrate judge mistakenly addressed the motion and granted it on February 7, 2008. General Casualty objected and filed a motion for review. The district court agreed that the magistrate judge had acted without authority; nonetheless, in an April 10, 2008 order, the district court agreed with the magistrate judge's ultimate conclusion that the failure to file a timely reply could be excused.

Both parties then filed motions for summary judgment. The district court granted General Casualty's motion for summary judgment and denied Plaintiffs' motion, holding that General Casualty had not acted in bad faith in initially refusing to provide coverage and defense to Shawnee County. The district court then explained that, even if General Casualty had acted in bad faith in denying Shawnee County's request for coverage, this refusal to defend was not a factor in the excess judgment. The district court further found that the underlying state court judgment was collusively obtained and unreasonable and, consequently, nothing prevented General Casualty from contesting its responsibility for the judgment. Finally, the district court partially granted General Casualty's request for attorneys' fees due to Plaintiffs' failure to admit a fact regarding their settlement with L.P.'s. Plaintiffs now appeal the district court's order granting General Casualty's motion for summary judgment and the partial grant of fees. General Casualty cross-appeals the district court's order allowing Plaintiffs to file an untimely reply to the garnishee's answer.

**DISCUSSION**

Plaintiffs argue that the district court erred in granting General Casualty's motion for summary judgment. They contend that General Casualty had explicit knowledge that Plaintiffs were asserting a covered claim, but despite this knowledge, it denied coverage in bad faith to Shawnee County due to its failure to conduct a reasonable investigation. Consequently, Plaintiffs argue that General Casualty is collaterally estopped from relitigating the issues determined in the underlying state court action. And, because General Casualty acted in bad faith, Plaintiffs contend the insurance company is liable for the entire judgment plus interest and attorneys' fees.

Plaintiffs raise six issues on appeal: (1) whether the district court erred in holding that collateral estoppel did not apply to prevent General Casualty from contesting its liability for the underlying state court judgment; (2) whether the district court erred in applying the collusive settlement standard from *Glenn v. Flemming*, 799 P.2d 79 (1990), to the underlying state court judgment; (3) whether coverage exists under General Casualty's policy for the judgment entered against Shawnee County in the underlying state court action; (4) whether General Casualty's coverage denial was in bad faith; (5) whether General Casualty is liable for the entire state court judgment against Shawnee County, plus interest and attorneys' fees, due to the insurer's bad faith denial of coverage; and (6) whether the district court abused its discretion in partially granting General

-16-

Casualty's motion for attorneys' fees.  In addition, General Casualty cross-appeals, arguing that the district court erred in granting Plaintiff's motion to file an untimely reply.  We address each of these issues in turn.

## I.  Summary Judgment

We review de novo the district's court decision to grant summary judgment and apply the same standard under Federal Rule of Civil Procedure 56(c).  *Duvall v. Ga.-Pac. Consumer Prods., L.P.*, 607 F.3d 1255, 1259 (10th Cir. 2010).  Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c) (2009) (amended 2010).  In "applying this standard, '[w]e examine the factual record in the light most favorable to the non-moving party.'"  *Narotzky v. Natrona Cnty. Mem'l Hosp. Bd. of Trs.*, 610 F.3d 558, 565 (10th Cir. 2010) (alteration in original) (quoting *Somoza v. Univ. of Denver*, 513 F.3d 1206, 1211 (10th Cir. 2008)).

### A.     *Applicability of the Collateral Estoppel Doctrine*

The district court found that General Casualty was "not seeking a review of the actual matter decided in state court"; instead, General Casualty was arguing over "whether it ha[d] the duty to indemnify Shawnee County."  Aplt. App. at 512.  As a result, the district court explained that "a judgment that remains valid against Shawnee County is not inconsistent with the Court's conclusion that

[General Casualty] is not responsible for the judgment." *Id.*

Plaintiffs argue that the district court was mistaken and that the collateral estoppel doctrine should apply because General Casualty breached its duty to defend and, thus, it is bound by the underlying judgment. Specifically, Plaintiffs contend that General Casualty breached its duty to defend when it sent the October 2006 letter rejecting Shawnee County's request for defense. However, as discussed extensively *infra*, General Casualty did not breach its duty to defend when it sent the October 2006 letter because, at that time, there was no legal or factual basis to believe that a vicarious liability suit would commence, and Plaintiffs' initial complaint did not reveal that they were seeking damages from Shawnee County on the basis of any negligence attributable to L.P.'s.

Collateral estoppel cannot be applied to an insurer who disclaims liability, but nonetheless has offered to defend under a reservation of rights. *See Henry v. Johnson*, 381 P.2d 538, 545 (Kan. 1963) ("[T]he rule . . . imposes two necessary essential elements. First, that the liability insurer must clearly disclaim liability under the policy, and second, it must give notice of the reservation of rights to set up defenses of noncoverage."); *see also Davin v. Athletic Club of Overland Park*, 96 P.3d 687, 690–91 (Kan. Ct. App. 2004). As a result, the cases cited by Plaintiffs are unpersuasive on this issue, and the district court was correct in concluding that collateral estoppel does not prevent it from considering whether General Casualty ought to be liable to Plaintiffs in this garnishment action.

-18-

*B.     Applicability of the Collusive Settlement Standard to the Underlying State Court Judgment*

Plaintiffs argue that the district court erred in applying the collusive settlement standard of *Glenn*, *supra*, to the underlying judgment and instead contend that *Crist v. Hunan Palace, Inc.*, 89 P.3d 573 (Kan. 2004), should control this situation.  General Casualty argues that the judgment rendered in the state court was collusive and unreasonable because Plaintiffs and Shawnee County agreed to a settlement that was essentially a consent judgment that the state court judge rubber stamped.  Plaintiffs respond that no consent judgment was entered in this case since the underlying case was tried before the Shawnee County District Court on July 18, 2007, and even if the judgment were construed as a consent judgment, it still would have a binding effect on General Casualty.

In our view, General Casualty has the better argument.  A factual recap helps to explain why.  On December 6, 2006, Plaintiffs' counsel sent a letter to Shawnee County detailing a proposed covenant not to execute against Shawnee County.  Along with the proposed covenant not to execute, he included a draft entry of judgment that is materially the same as the one the Shawnee County District Court ultimately entered.  Prior to the time Shawnee County accepted the Plaintiffs' covenant not to execute, General Casualty told the County that it was willing to defend the County, and that it did not approve of the County entering into any agreement that would concede or confess judgment and waive defenses.

However, the Board of County Commissioners approved the covenant not to execute and assignment of rights on July 5, 2007, and Shawnee County subsequently notified General Casualty that it was declining the offer for defense.

The present situation can be factually distinguished from *Crist*, the case that Plaintiffs rely upon. In *Crist*, the insurance company chose not to provide a defense, and the court pointed out that it could have protected itself by merely showing up. 89 P.3d at 580–81. As previously discussed, General Casualty offered a defense to Shawnee County as soon as it was made aware of the fact that Plaintiffs were raising vicarious liability claims; Shawnee County, however, refused General Casualty's offer and instead entered into a covenant not to execute, knowing that General Casualty objected to its terms.

Furthermore, in discussing why it refused the insurance company's invitation to examine the underlying judgment to ensure that it was free from fraud or collusion and had a good-faith factual basis, the *Crist* court pointed out that there was nothing in the record to suggest fraud or collusion in the trial or judgment. *Id.* at 581. That is not the situation here. Instead, there are clear indications of collusion between Plaintiffs and Shawnee County. It is disingenuous at best to argue that Plaintiffs and Shawnee County did not agree to any settlement amount. "Parties to litigation cannot concoct a scheme agreeing to a declaration of negligence and a . . . judgment and then expect the insurance company to be bound by that agreement without being able to defend itself

-20-

against the liability." *Davin*, 96 P.3d at 691.

While it is true that Plaintiffs presented evidence to the Shawnee County district judge, the County made no attempt to controvert the evidence presented by Plaintiffs because, under the covenant not to execute, the County had agreed not to contest Plaintiffs' evidence or present any evidence of its own. In fact, Shawnee County did not cross-examine a single witness, object to any of the evidence, or even offer a closing argument. Plaintiffs provided the court with a proposed journal entry—largely identical to the one that they sent Shawnee County as an attachment to their initial offer for the covenant not to execute—that identified the findings of the court, detailed the amounts of liability by category, and then determined the final judgment amount based upon the percentage of each party's fault. And, prior to trial, the County Attorney signed this draft approving the journal entry on behalf of the County, which included the amount of the judgment.

Therefore, while it is true that a judgment is generally subject to collateral attack only if it is void, an insurer may challenge a settlement or non-jury judgment in a garnishment action against the insurer to enforce the insurance contract. *Glenn*, 799 P.2d at 93. First, the insured has the burden of demonstrating that the amount of the settlement was reasonable and entered into in good faith. *Id.* Once the insured meets this burden, the insurer must then ultimately prove that the settlement was made in bad faith or the amount was

-21-

unreasonable.  *Id.*  Although the Kansas Supreme Court has approved the use of prejudgment covenants not to execute, it has "express[ed] concern over the reasonableness of assignment/covenants in which the amount of the judgment assigned has been determined by agreement of the parties" because such agreements "may not represent an arm's length determination of the value of the plaintiff's claim."  *Id.* at 92.

Here, the covenant not to execute entered into by the parties effectively removed any conflicting interest between them, which removes the inference that bargaining between the two sides would ensure a reasonable judgment amount.  In addition, the judgment amount in the entry of judgment failed to take into account the settlement reached between L.P's and Plaintiffs, and the trial record does not contain any discussion of this prior settlement.  The judgment would appear to be unreasonable, providing a seeming windfall to Plaintiffs.[11]  More to the point, the insured—that is, Plaintiffs, by virtue of the County's assignment—cannot under these circumstances meet its initial burden to show that the settlement amount was reasonable and entered into in good faith.

Finally, Plaintiffs and General Casualty argue over the significance of Plaintiffs and Shawnee County's agreement with the state court's assertion that

---

[11]    In addition, General Casualty discusses extensively the various defenses Shawnee County could and should have raised to protect itself from liability altogether, and points out that the proposed findings in the journal entry of judgment were therefore known to be entirely contrary to the facts and the law.

General Casualty had not filed an entry of appearance or requested to "become involved in this action." Aplee. Suppl. App. at 1676.[12] Plaintiffs stress that a motion to intervene is different than tendering a defense under a reservation of rights. Although it is true that General Casualty had not filed a motion to intervene, it certainly had expressed an intent to "become involved" in the action. Shawnee County was aware that General Casualty had offered to defend it in the action under a reservation of rights. In addition, the County Attorney was explicitly informed that General Casualty had specific objections to Shawnee County entering into the covenant not to execute and thereby waiving its defenses at trial. Therefore, it is disquieting that the parties told the state court unequivocally that General Casualty was not attempting to be involved. Given these facts, the district court did not err in finding that the underlying state court judgment was collusively obtained and, therefore, General Casualty could challenge it in this garnishment action.

C.    *Limits of Coverage Under L.P.'s Policy with General Casualty*

The first step in any bad faith action is to determine whether coverage exists under the insurance policy at issue for the underlying judgment. *See*

---

[12]    The relevant portion of the trial transcript reads: "The Court: And I also, for the record, state that we checked this morning and there was no entry of an appearance or any request by the insurance company to become involved in this action, as far as the Court or counsel are aware of; is that correct, gentlemen?" Aplee. Suppl. App. at 1676. Counsel for Plaintiffs and Shawnee County responded: "That's correct." *Id.*

*Ramsey v. Lee Builders, Inc.*, 95 P.3d 1033, 1038 (Kan. Ct. App. 2004)

(explaining "that if there is no coverage[,] there is no duty to defend"). In its

summary judgment order, the district court concluded that "absent a claim that

Shawnee County is liable for the negligence of L.P.'s, there is no coverage under

the contract." Aplt. App. at 498. This statement is correct. The Contractor's

Additional Insured Endorsement ("Endorsement") provides that Shawnee County

is an "additional insured" to the policy between L.P.'s and General Casualty.

However, the insurance provided to Shawnee County as the additional insured

was limited, as the Endorsement explains:

> [Shawnee County] is an additional insured *solely* for liability due
> to your negligence specifically resulting from "your work" for
> the additional insured which is the subject of the written contract
> or written agreement. *No coverage applies for any liability due
> to negligence attributable to any person or entity other than the
> Named Insured.*

Aplee. Suppl. App. at 1493 (emphasis added). In addition, the Endorsement

further limits the coverage by stating:

> The insurance provided to the additional insured *does not apply
> to*:
> "Bodily injury," "property damage," or "personal and advertising
> injury" *arising out of the rendering of, or failure to render, any
> professional architectural, engineering or surveying services*,
> including:
> > a. The preparing, approving, or failure to prepare or
> > approve maps, shop drawings, opinions, reports, surveys,
> > field orders, change orders or drawings and specifications;
> > and
> > b. *Supervisory, inspection, architectural or engineering
> > activities*.

-24-

*Id.* at 1493–94 (emphasis added). The Endorsement later repeats that General Casualty has "no duty to defend or indemnify an additional insured under this endorsement . . . [f]or any liability due to negligence attributable to any person or entity other than the Named Insured." *Id.* at 1494.

The rules regarding the interpretation of insurance policies under Kansas law are well established. "The language of an insurance policy, like any other contract, must, if possible, be construed in such way as to give effect to the intention of the parties." *O'Bryan v. Columbia Ins. Grp.*, 56 P.3d 789, 792 (Kan. 2002). "[I]f the policy language is clear and unambiguous, it must be construed in its plain, ordinary, and popular sense and according to the sense and meaning of the terms used." *Warner v. Stover*, 153 P.3d 1245, 1247 (Kan. 2007). A "policy is ambiguous when it contains language of doubtful or conflicting meaning based on a reasonable construction of the policy's language"; however, a term is not ambiguous simply "because the parties disagree on the interpretation of the language." *Marshall v. Kan. Med. Mut. Ins. Co.*, 73 P.3d 120, 130 (Kan. 2003). The test is "not what the insurer intends the language to mean, but what a reasonably prudent insured would understand the language to mean." *Am. Family Mut. Ins. Co. v. Wilkins*, 179 P.3d 1104, 1110 (Kan. 2008) (quoting *O'Bryan*, 56 P.3d at 793) (internal quotation marks omitted).

Consequently, any liability of Shawnee County that is "due to negligence

-25-

attributable to any person or entity other than the Named Insured" is not covered. Aplee. Suppl. App. at 1494. Under the plain language of the agreement, the General Casualty policy provides coverage only for Shawnee County's vicarious liability due to the actions of L.P.'s. Therefore, the 30% of the damages attributable directly to the County's negligence, rather than L.P.'s negligence, clearly falls outside the scope of the coverage.

General Casualty further argues that the 70% fault imputed to Shawnee County is also excluded from coverage under the policy because "[t]he sole basis for finding that 70% of the judgment should be imputed to the County was the circumstance that the professional engineering firm hired by the County supervised and inspected the work." Aplee. Br. at 15. Plaintiffs dispute this characterization of Shawnee County's involvement in the project, pointing out that the state court decision predicated the County's vicarious liability "on its right to *control* the acts" of L.P.'s, not on supervision alone. Aplt. Reply Br. at 12–14. However, the control that the County allegedly exercised, as identified by the state court decision, was purely based on the right of its hired professional engineering firm, Bartlett, to inspect the work, and the County's own authority to disapprove deviations from the plans and specifications. These activities fall within a common sense reading of the exclusion's language. Therefore, General Casualty's insurance policy does not provide coverage for the underlying state court judgment, and General Casualty's denial of coverage and defense was not in

-26-

bad faith.

  *D. General Casualty's Investigation: Reasonable or Denial in Bad Faith?*

  Even if the policy language discussed *supra* did not exclude Plaintiffs' claims from coverage, General Casualty's initial denial of defense could not be characterized as made in bad faith under Kansas law.  Plaintiffs argue that the district court erred in finding that General Casualty had not acted in bad faith in denying Shawnee County's request for defense.  Consequently, according to Plaintiffs, General Casualty should be held liable for the entire judgment rendered in state court due to this bad faith denial.  Plaintiffs contend that General Casualty: (1) failed to conduct a reasonable investigation under *Associated Wholesale Grocers, Inc. v. Americold Corp.*, 934 P.2d 65 (Kan. 1997); (2) failed to look beyond the pleadings and consider facts either brought to its attention or which it could have reasonably discovered in order to determine whether it had a duty to defend Shawnee County; and (3) had a duty to defend "even meritless suits that fall within coverage."  Aplt. Principal Br. at 19–34.

  A finding of bad faith is required to hold an insurer liable for a settlement or judgment in excess of its policy limits.  *Snodgrass v. State Farm Mut. Auto. Ins. Co.*, 804 P.2d 1012, 1021–23 (Kan. Ct. App. 1991); *accord Glenn*, 799 P.2d at 85 ("An insurance company may become liable for an amount in excess of its policy limits if it fails to act in good faith and without negligence when defending

and settling claims against its insured.").  As explained in *Snodgrass*:

> The conduct of the insurer must not be viewed through hindsight. Instead, the offer and the strength of the plaintiff's case must be viewed as they fairly appeared to the insurer and its agents and attorneys at the time the offer was refused . . . . Something more than a mere error of judgment is necessary to constitute bad faith.

804 P.2d at 1023 (quoting *Glenn*, 799 P.2d at 85).  When making a coverage decision, an insurer "must look beyond the effect of the pleadings and consider any facts brought to its attention or any facts which it could reasonably discover" and conduct a good-faith analysis based on this information.  *Patrons Mut. Ins. Ass'n v. Harmon*, 732 P.2d 741, 744 (Kan. 1987).

Plaintiffs argue that the factors outlined in *Americold Corp.* for analyzing an insurer's denial of defense support its argument that General Casualty acted in bad faith.  These factors include:

> (1) whether the insured was able to obtain a reservation of rights; (2) efforts or measures taken by the insurer to resolve the coverage dispute promptly or in such a way to limit any potential prejudice to the insured; (3) the substance of the coverage dispute or the weight of legal authority on the coverage issue; (4) the insurer's diligence and thoroughness in investigating the facts specifically pertinent to coverage; and (5) efforts made by the insurer to settle the liability claim in the face of the coverage dispute.

*Americold Corp.*, 934 P.2d at 90.

A summary of the events relating to General Casualty's coverage decision-making, however, effectively militates against a conclusion of bad faith. Shawnee County first provided notice to General Casualty of Plaintiffs' claims in

its June 30, 2006 letter.[13]  Shawnee County then reiterated its request for coverage and defense in its September 22, 2006 letter to which it attached Plaintiffs' original state court petition.  Each letter stated that it would "serve as a written demand . . . for a defense and payment of any claims related to this incident asserted against Shawnee County as a result of the negligence of  [L.P.'s]." Aplee. Suppl. App. at 1725, 1726.

The original state court petition claimed that "flooding was caused by the negligence of defendant L.P. [sic] Excavating by failing to meet its standard of care in closing off the sanitary sewer system . . . and [by] defendant Shawnee County, in failing to properly plan, inspect, maintain, repair, or upgrade as necessary, . . . the sanitary sewer system." *Id.* at 1522.  It further claimed that Shawnee County was "negligent in failing to act upon the negligence of L.P.'s Excavating." *Id.*  Based upon its review of the petition, the First Amended Petition, the insurance policy, the information developed by an independent adjustor, the Plaintiffs' demand letter to the City of Topeka, and the investigation conducted by defense counsel for L.P.'s, General Casualty informed the County that the claims asserted by Plaintiffs did not give rise to coverage under the policy.  However, General Casualty qualified this denial of coverage by expressing its willingness to reevaluate its position in light of any additional or

---

[13]    This letter was sent after Plaintiffs' settlement offer deadline had expired, but before Plaintiffs had actually filed suit.

-29-

new information.

On December 5, 2006, Shawnee County informed General Casualty that Plaintiffs believed Shawnee County would "be held responsible for the negligence of L.P.'s Excavating" and also explained that Plaintiffs intended to add additional plaintiffs to the action. *Id.* at 1742. However, this letter contained no new legal or factual arguments as to why Shawnee County would be vicariously liable for L.P.'s negligence. Nonetheless, on December 8, 2006, in response to this information, General Casualty requested a copy of the amended petition and reiterated its willingness to reevaluate its previous coverage decision. Despite this expression of a willingness to reconsider the initial coverage determination, Shawnee County had no further communications with General Casualty until June 15, 2007—one month before trial.

On June 15, 2007, after it had already filed its answer to Plaintiffs' Second Amended Petition, Shawnee County sent another letter to General Casualty with the Second Amended Petition and its answer attached. In this Second Amended Petition, Plaintiffs asserted for the first time that the County was vicariously liable for L.P.'s negligence, in addition to the County's own negligence. In response, on June 29, 2007, General Casualty faxed a letter to Shawnee County detailing its willingness to provide a defense under a reservation of rights, even though it disclaimed coverage under the policy.

Given the timeline of events, it is evident that General Casualty was not

-30-

informed of Plaintiffs' intention to pursue a claim of vicarious liability until well after General Casualty gave its initial coverage opinion in October 2006. The facts revealed from General Casualty's investigation of Plaintiffs' initial claims established that there was no relationship between Shawnee County and L.P.'s that might support vicarious liability because there was no contract between the two and the only role the County played in the project was enforcing its zoning rules and regulations. In fact, the County Attorney (who drafted all of the County's letters to General Casualty) agreed that there was no factual or legal basis for a claim of vicarious liability.

The record reflects that General Casualty looked beyond the pleadings to determine coverage. Therefore, Plaintiffs' contention that the insurer did not look beyond "the eight corners of [the] pleading and the applicable insurance policy," is without merit. *Miller v. Westport Ins. Corp.*, 200 P.3d 419, 424 (Kan. 2009) (quoting Robert H. Jerry, II & Douglas R. Richmond, Understanding Insurance Law 826, § 111[a] (4th ed. 2007)) (internal quotation marks omitted). The first possibility of a vicarious liability claim appears in the December 5, 2006 letter; General Casualty responded positively to this letter, indicating a willingness to reconsider its decision. Once Shawnee County forwarded the Second Amended Petition, which explicitly put Shawnee County's vicarious liability on the table, General Casualty expressed its willingness to defend Shawnee County. Therefore, General Casualty did not act in bad faith in denying coverage and a

-31-

defense to Shawnee County.

E.     *General Casualty's Potential Liability for the Entire State Court Judgment*

Plaintiffs argue that General Casualty should be held liable for the entire judgment, plus interest and attorneys' fees, due to its bad faith denial of coverage and defense. However, as discussed *supra*, General Casualty did not act in bad faith in initially denying Shawnee County's request for defense. Therefore, Plaintiffs are not entitled to amounts greater than the policy limit (if anything at all).

Additionally, even if General Casualty had acted in bad faith, the refusal to defend was not a factor in the excess judgment, and an insurer is not liable for an excess judgment without a showing that the excess judgment is traceable to an insurer's bad faith refusal to defend. *Snodgrass*, 804 P.2d at 1021. The determination of whether excess judgment liability is appropriate depends on the circumstances of each case. *Americold Corp.*, 934 P.2d at 92.

In this case, Shawnee County was represented by competent counsel, an Assistant County Attorney, from the time that Plaintiffs provided notice of their claim through the trial. It was this County Attorney who declined Plaintiffs' only settlement offer in May 2006. Shawnee County did not give General Casualty the opportunity to consider this settlement offer as the County did not inform General Casualty of this offer or even provide notice of the claim to General Casualty

-32-

prior to the offer's expiration.   As *Snodgrass* explains:

> Absent a settlement offer, the plain refusal to defend has no causal connection with the amount of the judgment in excess of the policy limits.  If the insured has employed competent counsel to represent him, there is no basis for concluding that the judgment would have been for a lesser sum had the defense been conducted by insurer's counsel.

804 P.2d at 1021 (quoting *George R. Winchell, Inc. v. Norris*, 633 P.2d 1174, 1177–78 (Kan. Ct. App. 1981)) (internal quotation marks omitted).  Even if General Casualty had acted in bad faith in denying Shawnee County's request, which we have already determined that it did not, the excess judgment cannot be fairly traced to this denial.  Thus, the district court was correct in determining that General Casualty cannot be held liable for the entire state court judgment, plus interest and costs.  Accordingly, we affirm the district court's order granting summary judgment to General Casualty.

## II.  General Casualty's Cross-Appeal

In its cross-appeal, General Casualty contends that the district court erred under Kansas law in granting Plaintiffs' motion to file an untimely reply to General Casualty's garnishment answer.  However, we decline to reach the merits of this cross-appeal because General Casualty was not aggrieved by the district court's judgment, and we have upheld that judgment.  *See Leprino Foods Co. v. Factory Mut. Ins. Co.*, 453 F.3d 1281, 1290 (10th Cir. 2006) (noting that "[o]nly a party aggrieved by the judgment may appeal"); *see also Burlington N. & Santa Fe*

-33-

*Ry. v. Grant*, 505 F.3d 1013, 1032 (10th Cir. 2007) (noting that "dismissal of cross-appeal is proper where a party presents alternate grounds to affirm, but does not 'ask[] that the judgment itself be altered'" (alteration in original) (quoting *Jarvis v. Nobel/Sysco Food Servs. Co.*, 985 F.2d 1419, 1426 n.7 (10th Cir. 1993))); *cf. Cook v. Rockwell Intern. Corp.*, 618 F.3d 1127, 1153 (10th Cir. 2010) ("A party who prevails in the district court is permitted to *conditionally* raise issues in a cross-appeal because if the appellate court decides to vacate or modify the trial court's judgment, the judgment may become *adverse to* the cross-appellant's interests." (emphasis added)). Because we affirm the district court's grant of summary judgment in its favor, the issue raised in General Casualty's cross-appeal is effectively moot.

### III. Attorneys' Fees Motion

We review the district court's award of attorneys' fees pursuant to Federal Rule of Civil Procedure 37(c)(2) for an abuse of discretion. *Harolds Stores, Inc. v. Dillard Dept. Stores, Inc.*, 82 F.3d 1533, 1553 (10th Cir. 1996). "Under the abuse of discretion standard, a trial court's decision will not be disturbed unless the appellate court has a definite and firm conviction that the lower court made a clear error of judgment or exceeded the bounds of permissible choice in the circumstances." *Fed. Deposit Ins. Corp. v. Rocket Oil Co.*, 865 F.2d 1158, 1160 n.1 (10th Cir. 1989). We have further explained: "A district court abuses its discretion where it commits a legal error or relies on clearly erroneous factual

findings, or where there is no rational basis in the evidence for its ruling." *Davis v. Mineta*, 302 F.3d 1104, 1111 (10th Cir. 2002) (citation omitted).

The district court partially granted General Casualty's motion for attorneys' fees pursuant to Rule 37(c) as a result of Plaintiffs' alleged violation of Rule 36(a)(4) in refusing to admit that they had already accepted over $800,000 from General Casualty to settle their claims against L.P.'s. The Request for Admission at issue reads: "Garnishee paid plaintiffs $800,000.00 to settle the liability of L.P.'s Excavating, Inc. for the events described in the journal entry of judgment entered on July 18, 2007." Aplt. App. at 1054. In response, Plaintiffs denied this request for admission without any further explanation.

When responding to a party's request for an admission, the answering party must admit, specifically deny, or state in detail why the request cannot truthfully be admitted or denied. Fed. R. Civ. P. 36(a)(4). "A denial must fairly respond to the substance of the matter; and when good faith requires that a party qualify an answer or deny only part of a matter, the answer must specify the part admitted and qualify or deny the rest." *Id.* Federal Rule of Civil Procedure 37(c)(2) provides:

> If a party fails to admit what is requested under Rule 36 and if the requesting party later proves . . . the matter true, the requesting party may move that the party who failed to admit pay the reasonable expenses, including attorney's fees, incurred in making that proof. *The court must so order unless*:
> (A) the request was held objectionable under Rule 36(a);

(B) *the admission sought was of no substantial importance*;
(C) the party failing to admit had a reasonable ground to believe that it might prevail on the matter; or
(D) there was other good reason for the failure to admit.

Fed. R. Civ. P. 37(c)(2) (emphasis added).

On appeal, Plaintiffs contend that this grant of fees was erroneous for two reasons: (1) it was a proper denial because General Casualty had misstated the total settlement between Plaintiffs and L.P's as $800,000 rather than $855,500.10, and (2) Plaintiffs' failure to admit this request was not of substantial importance because General Casualty was in possession of the signed releases executed by Plaintiffs from the initial disclosures.

It is beyond dispute that Plaintiffs were aware of the settlement reached between themselves and L.P.'s, and that they had been paid $855,500.10 by the time General Casualty requested the admission. Plaintiffs' argument that their denial was proper because General Casualty misstated the amount is not consonant with the requirements of good faith within the rule; Plaintiffs should have at least qualified their denial. Furthermore, the district court found that it could not conclude that the request "was of no substantial importance as the foundation of this action regards [General Casualty's] liability of payment for damages Plaintiffs sustained, and Plaintiffs have provided no reasonable explanation or excuse for failing to admit the request." Aplt. App. at 516.

Plaintiffs point out that they had already disclosed this information by

-36-

supplying the actual release documents during their initial disclosures and argue that, due to this disclosure in another form, the district court erred in granting General Casualty's motion for attorneys' fees. The fact that Plaintiffs had already provided the information in another form does not relieve Plaintiffs of their obligation to comply with Rule 36(a)(4); instead, this fact goes to the amount of reasonable expenses the requesting party could demand. However, Plaintiffs make clear that they are not contesting the amount of the fee imposed by the court, but rather the imposition of the fee in the first instance. Consequently, we conclude that the district court did not abuse its discretion in assessing attorneys' fees for Plaintiffs' failure to comply with Rules 36(a)(4) and 37(c)(2).

## CONCLUSION

Based on the foregoing, we **AFFIRM** the district court's order granting General Casualty's summary judgment motion, **AFFIRM** the district court's partial grant of attorneys' fees to General Casualty, and decline to reach General Casualty's cross-appeal as moot.

ENTERED FOR THE COURT

Jerome A. Holmes
Circuit Judge